NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:

BYRON B. COLEMAN,

       Debtor.

-------------------------------------------------------------x
YONKERS ISLAMIC CENTER, INC.,

       Plaintiff,

  -against-

BYRON B. COLEMAN,

       Defendant.
-------------------------------------------------------------x

Chapter 7

Case No. 22-35576 (KYP)

Adv. Pro. No. 22-09024 (KYP)

**POST-TRIAL MEMORANDUM OF DECISION CONCLUDING THAT
THE DEBT OWED TO YONKERS ISLAMIC CENTER, INC.
IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(4)**

**APPEARANCES:**

CARLOS J. CUEVAS, ESQ.
*Counsel for Yonkers Islamic Center, Inc.*
1250 Central Park Avenue
Yonkers, NY 10704


BYRON B. COLEMAN
*Pro Se Defendant*
P.O. Box 342
Yonkers, NY 10705


**HONORABLE KYU YOUNG PAEK**
**UNITED STATES BANKRUPTCY JUDGE**

# INTRODUCTION

Plaintiff Yonkers Islamic Center, Inc. ("YIC") commenced this adversary proceeding against Debtor-Defendant Byron B. Coleman ("Coleman") for a determination that its claim is not subject to the bankruptcy discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).  In general, YIC asserts that Coleman misappropriated $364,000.00 from YIC's bank account, while acting as a fiduciary to YIC, and used a significant portion of the funds to purchase a property located at 8 Crown Boulevard, Newburgh, New York ("Property").  Trial in this matter took place on December 11, 2024,[1] and the Court heard testimony from:

- Misbah Salis ("Salis") – the secretary of YIC (*see* Tr. at 19:17-45:9);
- Yulia Kushnir ("Kushnir") – YIC's expert witness on the rental value of the Property (*see* Tr. at 45:25-52:9);
- Robert Zerilli ("Zerilli") – YIC's attorney in the State Court Action (defined *infra*) (*see* Tr. at 55:10-72:15);
- Coleman (*see* Tr. at 75:4-108:2); and
- Adam Adamu ("Adamu") – YIC's "Imam," *i.e.*, religious leader (Tr. at 108:17-177:6).

YIC's exhibits ("YIC Ex. _") A through Q were admitted into evidence, except YIC Exs. J and M, which were used by YIC for impeachment purposes.  (Tr. at 12:22-13:1; 115:21-116:3.)  Coleman's exhibits ("Coleman Ex. _") 1 through 3 were admitted into evidence.

---

[1]  The trial transcript is available at ECF Doc. # 117, and citations to the transcript will be denoted as "Tr. at _." "ECF Doc. # _" refers to documents filed on the electronic docket of this adversary proceeding. "ECF Main Case Doc. # _" refers to documents filed on the electronic docket of Coleman's Chapter 7 bankruptcy case.

2

(Tr. at 14:16-23.) After trial, the parties submitted proposed findings of fact and conclusions of law.[2]

Based on the evidentiary record at trial, the Court concludes that the YIC Claim (defined *infra*) is excepted from the bankruptcy discharge because it is a debt for defalcation while acting in a fiduciary capacity within the meaning of 11 U.S.C. § 523(a)(4). This memorandum of decision constitutes the Court's findings of fact and conclusions of law under Rule 52(a)(1) of the Federal Rules of Civil Procedures made applicable hereto by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## JURISDICTION

This Court has jurisdiction over the claims asserted in this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* (M-431), dated January 31, 2012 (Preska, C.J.) referring bankruptcy cases and proceedings to the Bankruptcy Judges of the Southern District of New York. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## FINDINGS OF FACT

**A.     The YIC and Coleman's Role at the YIC**

The YIC was founded in 1996 and is a religious institution operating a mosque in Yonkers, New York. (*See* Certificate of Incorporation and Bylaws of YIC ("YIC Bylaws");[3] Tr. at 19:24-20:22.) The YIC has approximately 100 to 200 members, and Adamu has served as the religious leader of the YIC since its inception. (Tr. at 20:10-

---

[2]    *See The Proposed Findings of Fact and Conclusions of Law of the Yonkers Islamic Center, Inc.*, dated Feb. 6, 2025 ("YIC Brief") (ECF Doc. # 120), and *Submission of Byron Coleman*, docketed on Feb. 7, 2025 ("Coleman Brief") (ECF Doc. # 122).

[3]    The YIC Bylaws were admitted into evidence as YIC Ex. Q.

3

21:18, 108:23-109:3.) The YIC's operations are governed by a board of directors ("Board") and officers. (YIC Bylaws, Art. 5; Tr. at 21:19-25.) The officer positions include a president, a secretary, and a treasurer. (YIC Bylaws, Art. 5, Sec. 2.) In addition to directors and officers, the YIC had a committee ("Ash-Shura Committee") to advise Adamu and the YIC. (Tr. at 113:7-10.) Coleman joined the Ash-Shura Committee in 2017 at Adamu's request. (Tr. at 96:17-25.)

The parties dispute whether Coleman was the treasurer of YIC in August 2017. Coleman testified that he did not serve as YIC's treasurer. (Tr. at 79:24-80:1.) Adamu and Salis testified to the opposite. Adamu had known Coleman for many years; Coleman would speak to Adamu after sermons, volunteer to drive Adamu places he needed to go, and generally advised Adamu. (Tr. at 145:11-146:9.) Adamu testified that he offered Coleman the treasurer position at a meeting held at Coleman's apartment to select officers, and Coleman accepted the role. (Tr. at 117:2-16; *see also* 176:9-18 (Adamu testifying that he appointed Coleman treasurer because he trusted Coleman).) Salis testified that he had known Coleman for eight years, Coleman held the role of YIC treasurer during the relevant period, and Salis had observed Coleman performing the duties of a treasurer. (Tr. at 23:2-16, 24:8-10.) Although the parties dispute whether Coleman was YIC's treasurer, the parties do not dispute that Coleman was an authorized signatory of YIC's account with Chase Bank ("YIC Bank Account"). (Tr. at 24:11-13, 80:2-4, 106:2-9, 119:1-5.)[4]

---

[4] Coleman testified that several others initially had signatory authority over the YIC Bank Account. (Tr. at 97:13-15.)

On this disputed factual issue, the Court finds that Coleman was YIC's treasurer in August 2017. Adamu credibly testified about the circumstances under which Coleman was appointed treasurer, Salis credibly testified that he observed Coleman performing treasurer duties during the relevant period, and Coleman had signatory authority over the YIC Bank Account.

**B.     Transfer of YIC's Funds and Coleman's Purchase of the Property**

On August 16, 2017, Adamu and Salis were in Atlanta, Georgia to visit Adamu's daughter. (Tr. at 24:14-19, 119:6-11.) That evening, Adamu received a notification from Chase Bank alerting him that $360,000.00 had been transferred from the YIC Bank Account. (Tr. at 25:9-12, 119:11-18.) Adamu called Chase Bank and was on the phone with the bank for roughly forty-five minutes. (Tr. at 120:8-11.) During the call, Adamu learned that Coleman had transferred the funds from the YIC Bank Account. (Tr. at 120:11-13.) The bank representative told Adamu that he would have to speak with the bank's local branch manager to resolve the situation. (Tr. at 120:14-17.) Adamu and Salis immediately returned to New York and visited the local Chase Bank branch but were unable to reverse the transfer of funds. (Tr. at 41:16-42:2, 120:18-25.)

Coleman confirmed that, on August 16, 2017, he transferred $360,000.00 from the YIC Bank Account to his personal bank account. (Tr. at 80:17-24; *see also* YIC Ex. L (Coleman's bank account statement showing a deposit of $360,000.00 on August 16, 2017).) On January 4, 2018, Coleman purchased the Property using $230,000.00 in cash. (Tr. at 82:8-83:8.) Of that amount, $218,000.00 constituted funds that were previously transferred from the YIC Bank Account to Coleman's bank account. (Tr. at 83:10-15.) Coleman took title of the Property in his own name. (Tr. at 83:16-19.)

5

Coleman resided at the Property (Tr. at 86:17-20),[5] and Kushnir testified that the fair market rent for the Property in 2022 was about $3,000.00, and the fair market rent at the time of trial was about $3,300.00. (Tr. at 50:3-21.)

The transfer of the funds negatively impacted YIC's ability to fund its youth education program and program to feed homeless people. (Tr. at 124:8-25.) It also worsened morale among the YIC community. (Tr. 124:1-2.) Importantly, YIC had to forego its plans to build a freestanding mosque because it no longer had the funds. (Tr. at 28:5-14, 124:5-7.) Instead, the YIC continues to operate in a leased space, and the majority of member donations go toward rent payments. (Tr. at 124:25-125:1.)

**C.    Efforts to Recover the Funds from Coleman**

YIC made various efforts to recover the funds from Coleman. Initially, Board members tried to get in contact with Coleman but received no response. (Tr. at 42:5-21.) When Board members eventually got in touch with Coleman, he stated that he would not return the funds. (Tr. at 29:8-12, 44:25-45:5.) Coleman also refused to transfer the funds into a different account controlled by him and two other YIC members so that the funds were not in an account controlled solely by him. (Tr. at 122:5-9.) Coleman told Adamu and other YIC members that he would rather go to jail than return the money. (Tr. at 45:4-8; 122:15-19.)

Coleman offered to invest the funds by purchasing real property, but Adamu refused the offer. (Tr. at 123:5-11.) Subsequently, Coleman offered to give Adamu

---

[5]    YIC reported in its post-trial brief that a foreclosure proceeding was commenced against the Property by the mortgagee on December 26, 2024. (YIC Brief, ¶ 129.) The complaint in the foreclosure action alleged that the mortgage had been in default since October 2022, and the affidavit of attempted service reported that the Property had been abandoned. (*Id.* ¶¶ 130-31.)

6

$20,000.00 if Adamu permitted Coleman to use the funds as he saw fit; Adamu refused that offer as well. (Tr. at 123:12-19.)

The YIC also filed a police report against Coleman, (Tr. at 42:23-25), but the police told Adamu that the matter was a civil matter, not a criminal matter. (Tr. at 121:8-17.)

**D.    The State Court Action**

On October 9, 2018, YIC commenced a civil action in the Supreme Court of the State of New York, County of Westchester ("State Court") captioned *Yonkers Islamic Center, Inc. v. Coleman*, Index No. 67438/2018 ("State Court Action") asserting the following causes of action against Coleman: theft, fraud, unjust enrichment, conversion, breach of fiduciary, imposition of a constructive trust over the Property, and an accounting. (*See Verified Complaint*, dated Oct. 9, 2018.)[6]

On June 13, 2019, the parties to the State Court Action entered into a *Stipulation of Settlement* ("Settlement Stipulation")[7] whereby Coleman agreed to return $364,000.00 to YIC less (i) funds held in escrow with YIC's attorney totaling $123,270.08, (ii) funds realized from the "sale, refinancing, lease or rental" of the Property "purchased and mortgaged in Byron Coleman's name but deeded to YIC in an as of yet unrecorded Quit Claim Deed," and (iii) amounts that the Board determined were spent by Coleman "to further the interests of YIC." (Settlement Stipulation, ¶ 3.) The Settlement Stipulation further provided that the amounts not covered by the

---

[6]    YIC's complaint in the State Court Action was admitted into evidence as YIC Ex. C.

[7]    The Settlement Stipulation was admitted into evidence as YIC Ex. D.

7

escrowed funds would be paid "within a time to be determined by the Board of YIC based upon its choice of whether to sell, refinance, lease or rent the Property." (*Id.* ¶ 4.)

Coleman failed to transfer title to the Property, YIC moved in the State Court Action to enforce the Settlement Stipulation, and the State Court granted the motion in part. (*See Decision & Order*, dated July 22, 2022 ("Enforcement Order").)[8] The State Court found that the Settlement Stipulation plainly required Coleman to transfer title of the Property to YIC via a quitclaim deed, and therefore, Coleman must comply with that portion of the Settlement Stipulation. (Enforcement Order at 4-5.)

Coleman did not execute the quitclaim deed, and in December 2023, the State Court issued an order to show cause seeking to hold Coleman in civil and criminal contempt for violating the Enforcement Order. This proceeding led to the State Court's entry of its *Decision, Conditional Order and Judgment of Contempt* on July 10, 2024 ("Conditional Contempt Judgment").[9] The State Court found Coleman to be in civil contempt:

> [T]he court in its discretion, finds Coleman in civil contempt. In so finding, the court has determined that the [Enforcement Order] being a lawful order of this court, clearly expressing an unequivocal mandate that has been [in] effect for almost two years; the [Enforcement Order] has clearly been disobeyed as Coleman has failed to produce a quitclaim deed even though [YIC] had sent him a proposed one; Coleman has not denied that he had knowledge of the [Enforcement Order]; and it is with reasonable certainty, that the [Enforcement Order] has been disobeyed.

---

[8]  The Enforcement Order was admitted into evidence as YIC Ex. E.

[9]  The Conditional Contempt Judgment was admitted into evidence as YIC Ex. N. Coleman filed his Chapter 7 bankruptcy petition on September 12, 2022, but this Court granted YIC's motion for relief from the automatic stay to continue prosecution of the State Court Action. (*See* ECF Main Case Doc. # 69.)

8

(Conditional Contempt Judgment at 3.) The State Court also found Coleman to be in criminal contempt:

> Likewise, [YIC] also establishes Coleman's willful disobedience of the [Enforcement Order], as required to support a finding of criminal contempt. The record shows that Coleman knew about the [Enforcement Order], did not appeal the same, and totally disregarded it because he did not agree that it was the proper course. The court finds beyond a reasonable doubt that Coleman lacked respect for the Order, by failing to abide by it for two years, which warrants a finding that Coleman is in criminal contempt.

(*Id*. at 4.) The State Court ordered Coleman to deliver a quitclaim deed to YIC by July 22, 2024, and if Coleman failed to do so, he would be fined $250.00 per day beginning on July 23, 2024 and be subject to a statutory fine of $10,000.00. (*Id*. at 5.)

Coleman moved for re-argument of the Conditional Contempt Judgment on the basis that the attorney who drafted the Settlement Stipulation had a non-waivable conflict of interest. The State Court rejected that argument and denied Coleman's motion. (*See Decision & Order*, dated Sept. 30, 2024.)[10]

On September 30, 2024, the State Court entered a *Judgment* ("Sanctions Judgment"),[11] requiring Coleman to pay $19,545.00 to YIC based on the terms of the Conditional Contempt Judgment and requiring the Sheriff of Orange County to execute a deed and other documents needed to transfer title in the Property from Coleman to YIC. (Sanctions Judgment at 1-2.) During the instant trial, Zerilli testified that the quitclaim deed transferring title to YIC had not yet been recorded with the Orange

---

[10]   This order was admitted into evidence as YIC Ex. O.

[11]   The Sanctions Judgment was admitted into evidence as YIC Ex. P.

9

County Clerk because YIC did not have Coleman's social security number, which was needed for the recording documents. (Tr. at 62:7-21.)

### E. Whether the $360,000.00 Transfer was Authorized by YIC

A disputed fact pertinent to the claims asserted in this adversary proceeding is whether YIC authorized Coleman's transfer of $360,000.00 from the YIC Bank Account to his personal bank account on August 16, 2017. In the period prior to the transfer, there was division among the leadership of the YIC. Coleman testified that Adamu accused James Simmons ("Simmons") – the YIC president at the time[12] – of stealing YIC money, and Simmons accused Adamu of the same. (Tr. at 96:7-15.) According to Coleman, in the months leading up to the transfer, certain Board members and other YIC members urged him to transfer the funds from the YIC Bank Account to his personal account because he was the only member remaining who had signatory authority over the YIC Bank Account. (Tr. at 97:20-23.) Thus, Coleman transferred the funds from the YIC Bank Account into his personal account. (Tr. at 98:7-9.) Coleman also testified that the Board approved of his purchasing the Property so long as he made repairs to the Property, sold the Property for a profit, and repaid the amount owed to the YIC with interest. (Tr. at 99:14-19.)

Adamu similarly testified that there was division among the YIC leadership in the period prior to the transfer. (Tr. at 136:17-137:23.) Adamu stated that the YIC had to replace Board members because of this in-fighting. (Tr. at 137:8-23, 142:20-25.)[13]

---

[12]    Adamu disputes that Simmons was the president. (Tr. at 133:20-23.)

[13]    The identity of the leadership of YIC was a disputed issue in the State Court Action. (*See, e.g.*, Enforcement Order at 1 ("During the litigation, disputes arose as to whether [Adamu], who verified the complaint, was the duly authorized President of [YIC] at the time and whether he had authority to commence the action.").)

Adamu testified that neither he nor the Board authorized Coleman to transfer $360,000.00 into his personal account. (Tr. at 119:19-120:5.)

Based on the evidence presented at trial, the Court finds that the YIC and the Board did not authorize Coleman to transfer $360,000.00 from the YIC Bank Account to his personal account. It is plain that there were major disagreements among factions within the YIC, and it is likely that Coleman had discussions with certain individuals who agreed that transferring funds from the YIC Bank Account was the proper course.[14] The weight of the evidence, however, supports the conclusion that Coleman did not receive the requisite Board authorization to transfer $360,000.00 into his personal account. In addition to testimony from Adamu to that effect, Coleman's behavior after the transfer establishes that the transfer was not approved by the Board. He:

- refused to join a Board meeting to explain why he took the money (Tr. at 42:2-21);
- ceased communication with members of the YIC for a period of time after the transfer (Tr. at 126:25-127:14 ("Q: So [Coleman] just disappeared[?] A: He just disappeared."));
- told Board members that he would not return the money (Tr. at 29:6-12, 44:25-45:5);
- stated that he would rather go to jail than return the money (Tr. at 45:4-8; 122:15-19); and
- offered Adamu $20,000.00 to allow Coleman to use the money as he saw fit (Tr. at 123:12-19).

---

[14] In the early stages of the State Court Action, Simmons and an individual named Mahmood Ahmad ("Ahmad") submitted affidavits stating that Coleman received Board authorization to transfer the funds from the YIC Bank Account to protect the funds from Adamu. (*See Affidavit of James Simmons Jr. in Opposition to Plaintiff's Order to Show Cause*, signed Nov. 14, 2018 (admitted into evidence as Coleman Ex. 1), and *Affidavit of Mahmood Ahmad in Opposition to Plaintiff's Order to Show Cause*, signed Nov. 14, 2018 (admitted into evidence as Coleman Ex. 2).) Neither Simmons nor Ahamd was a witness in the instant trial.

11

These actions are wholly inconsistent with the actions of an individual who had received Board approval to transfer the funds.

Coleman is also the defendant in the State Court Action, in which the YIC seeks the return of the funds Coleman took.  As detailed *supra*, Coleman agreed in June 2019 to transfer title in the Property to the YIC but failed to do so and has been held in civil and criminal contempt by the State Court for his refusal.

Based on the foregoing, the Court finds that Coleman did not have approval of the Board and the YIC to transfer $360,000.00 into his personal account.

**F.    The Bankruptcy Case, the YIC Claim, and this Adversary Proceeding**

On September 12, 2022, Coleman filed a petition for relief under Chapter 7 of the Bankruptcy Code.  (ECF Main Case Doc. # 1.)  The YIC filed a proof of claim on June 26, 2023 in the amount of $205,349.92 ("YIC Claim") representing (i) amounts that remain outstanding under the Settlement Stipulation, and (ii) amounts based on Coleman's use and occupancy of the Property.  (*See* Claim 9-1.)

On October 4, 2022, YIC commenced this adversary proceeding contending that the YIC Claim is not subject to the bankruptcy discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).  (*See Complaint to Determine Dischargeability of Debt* ("Complaint") (ECF Doc. # 1).)  A trial on this matter took place on December 11, 2024.

## CONCLUSIONS OF LAW

**A.    Defalcation While Acting in Fiduciary Capacity**

Exceptions to discharge under section 523(a) of the Bankruptcy Code are "narrowly construed" in favor of the debtor.  *Cazenovia College v. Renshaw* (*In re Renshaw*), 222 F.3d 82, 86 (2d Cir. 2000).  The creditor bears the burden of proving by a preponderance of the evidence that its claim is not subject to the bankruptcy

discharge. *Grogan v. Garner*, 498 U.S. 279, 286-91 (1991). As pertinent here, section 523(a)(4) provides that a bankruptcy discharge "does not discharge an individual debtor from any debt . . . for . . . defalcation while acting in a fiduciary capacity . . . ." 11 U.S.C. § 523(a)(4).

### 1. Fiduciary Capacity

To sustain a defalcation claim under section 523(a)(4), the creditor "must first establish that the debtor acted while in a fiduciary capacity." *Zohlman v. Zoldan*, 226 B.R. 767, 772 (S.D.N.Y. 1998) (citations omitted). The Bankruptcy Code does not define "fiduciary." *Hu v. Liu* (*In re Liu*), 658 B.R. 231, 241 (Bankr. E.D.N.Y. 2024) (citation omitted). The meaning of "fiduciary" under section 523(a)(4) is a matter of federal law and "is to be narrowly construed so that it does not reach debtor-creditor transactions in which the debtor merely violated the terms of his commercial agreement with the creditor." *Zohlman*, 226 B.R. at 772 (citations omitted); *accord Sandak v. Dobrayel* (*In re Dobrayel*), 287 B.R. 3, 14 (Bankr. S.D.N.Y. 2002) ("The meaning of 'fiduciary capacity' under Federal laws is more restricted than under the more general common law or state law definitions.") (citing supporting authorities). Fiduciary relationships covered by section 523(a)(4) include those created by "an express trust, technical trust, or statutorily imposed trust" as well as other relationships characterized by "a difference in knowledge or power between the fiduciary and principal which gives the former a position of ascendency over the latter." *Major, Lindsey & Africa, LLC v. Mahn* (*In re Mahn*), 666 B.R. 883, 893-94 (Bankr. S.D.N.Y. 2025) (quoting *Mirarchi v. Nofer* (*In re Nofer*), 514 B.R. 346, 353 (Bankr. E.D.N.Y. 2014) and *Andy Warhol Found. for Visual Arts v. Hayes* (*In re Hayes*), 183 F.3d 162, 167 (2d Cir. 1999)).

Although the definition of fiduciary capacity is a matter of Federal law, "the determination of whether a fiduciary relationship exists often turns on relationships governed by state law." *Liu*, 658 B.R. at 241 (citing *Vill. Mortg. Co. v. Veneziano (In re Veneziano)*, 615 B.R. 666, 675 (Bankr. D. Conn. 2020)). Under New York law governing not-for-profit corporations, officers are fiduciaries to the corporation. N.Y. NOT-FOR-PROFIT CORP. LAW § 717(a) (McKinney 2025) ("Directors, officers and key persons shall discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."); *People v. Trump*, 88 N.Y.S.3d 830, 839 (N.Y. Sup. Ct. 2018) ("Section 717 also requires directors and officers of a not-for-profit corporation to act with undivided loyalty toward the corporation."); *accord Am. Baptist Churches of Metro. NY v. Galloway*, 271 A.D.2d 92, 98 (N.Y. App. Div. 2000) ("Not-for-profit corporations in New York routinely bring actions seeking damages for breach of contract, breach of fiduciary duty and fraud.").

Here, YIC was incorporated under section 402 of the New York Not-for-Profit Corporation Law. (*See* YIC Ex. Q (YIC certificate of incorporation).) As outlined *supra*, Coleman was YIC's treasurer at the time of the transfer with signatory authority over the YIC Bank Account. Therefore, Coleman was acting in a fiduciary capacity when he transferred the funds from the YIC Bank Account to his personal bank account.

### 2. Defalcation

The Supreme Court in *Bullock v. BankChampaign, N.A.* analyzed "defalcation" for purposes of section 523(a)(4) as follows:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is

14

> improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation."

569 U.S. 267, 273-74 (2013) (citations omitted) (emphasis in original). To prove defalcation, the creditor must establish that the debtor acted with a "culpable state of mind" in committing the acts giving rise to the debt. *J-K Apparel Sales Co. Inc. v. Jacobs* (*In re Jacobs*), Adv. Pro. No. 22-01074 (MEW), 2024 WL 3579469, at *4 (S.D.N.Y. July 29, 2024) (citation omitted). "Mere negligence, without some element of intentional wrongdoing, breach of fiduciary duty or other identifiable misconduct, does not constitute a 'defalcation' within the meaning of section 523(a)(4)." *Mahn*, 666 B.R. at 895 (quoting *Adamo v. Scheller* (*In re Scheller*), 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001)). But defalcation "need not rise to the level of fraud, embezzlement, or misappropriation." *Scheller*, 265 B.R. at 53.

Here, Coleman's transfer of $360,000.00 from the YIC Bank Account to his own bank account satisfies the requirements for defalcation. At minimum, Coleman exhibited recklessness and a conscious disregard of his fiduciary duties by transferring the funds into his personal bank account without requisite Board approval, refusing to return the funds when prompted by Board members, and using a significant portion of the funds to purchase the Property in his own name. Coleman's actions constitute a gross deviation from the standard of conduct that a reasonable treasurer would have

15

exhibited, and prevented the YIC from building a freestanding mosque and sufficiently funding its youth education and food programs.

Therefore, the YIC Claim is a debt for defalcation while acting in a fiduciary capacity within the meaning of 523(a)(4) of the Bankruptcy Code and is excepted from discharge.

## **CONCLUSION**

For the reasons stated, the YIC Claim is excepted from the bankruptcy discharge because the debt is for defalcation while acting in a fiduciary capacity within the meaning of 11 U.S.C. § 523(a)(4). In light of the Court's ruling, the Court need not address whether the YIC Claim is excepted from discharge under other subsections of section 523(a). Counsel to the YIC shall submit an order consistent with this Memorandum of Decision via the Court's eOrders system.



**/s/ Kyu Y. Paek**

_____

**Dated: June 11, 2025**
**Poughkeepsie, New York**

**Hon. Kyu Y. Paek**
**U.S. Bankruptcy Judge**